B. Lance Entrekin (#016172)
**The Entrekin Law Firm**
One East Camelback Road, #710
Phoenix, Arizona 85012
(602) 954-1123
Fax: (602) 682-6455
lance@entrekinlaw.com
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| TYRRELL PETERSON, | NO. |
| Plaintiff, | |
| v. | |
| GENERAL MOTORS LLC, a foreign limited liability company; AC DELCO, a division of GENERAL MOTORS LLC, | **COMPLAINT** **(Personal Injury - Motor Vehicle Product Liability)** |
| Defendants. | |

For his Complaint, Plaintiff alleges as follows.

**PARTIES**

1. Plaintiff Tyrrell Peterson is a citizen of Arizona, was at all times material hereto, purchased the subject vehicle in Arizona and the injuries complained of herein occurred in Arizona.

2. The vehicle at issue herein was manufactured and sold by non party General Motors Corporation, which has gone bankrupt. Defendant General Motors LLC ("GM") is a foreign limited liability corporation formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.

3. In an Order dated July 5, 2009, in the bankruptcy case *In re General Motors*, 09-50026 REG (Bank. SDNY 2009), at Article II, Section 2.3(a)(ix), GM agreed to be fully liable for "all Liabilities to third parties for...personal injury...caused by...the component parts of...motor vehicles...manufactured, sold or delivered by (General Motors Corporation) which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen

on or after (July 9, 2009) and arise from such motor vehicles' operation or performance..." This case involves personal injuries arising on January 28, 2015 caused by the failure of a component during the operation of a vehicle manufactured and sold by non party General Motors Corporation. GM has therefore assumed all liability for the product's design, manufacture and sale.

4. On information and belief, the subject component was actually manufactured by Defendant AC Delco. On information and belief, AC Delco is an operating division of GM.

**JURISDICTION**

5. Diversity jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Arizona, Defendants are citizens of Delaware and Michigan and the amount in controversy exceeds the jurisdictional minimum.

6. Personal jurisdiction, determined by the minimum contacts test set forth in *International Shoe Co. v. Washington*, 326 U.S. 310 (U.S. 1945) and its progeny, is easily satisfied here. Plaintiff is a resident of the forum and consents to its jurisdiction. Defendants do very substantial business in Arizona, own very substantial property in Arizona and have conceded personal jurisdiction in Arizona federal district court on many occasions.

**VENUE**

7. Venue is proper under 28 U.S.C. § 1391(b)(2). The product at issue was advertised and sold in this district, it failed in this district, causing injury in this district and that is the basis of the Complaint.

**GENERAL ALLEGATIONS**

**BY THE LATE 1990'S, IT WAS WELL KNOWN IN THE INDUSTRY THAT PLASTIC END CAPS ON HEATER CORES WERE PRONE TO RUPTURE**

8. A "heater core" is a metal box that holds hot liquid, under the dash board of a vehicle. A fan blows over the heater core and through a vent, onto the feet and legs of the driver or passenger, creating warmth for them in the Winter. The heater core is sealed on one end with an "end cap."

9. In the 1980's, as the price of metal commodities rose, some car manufacturers

stopped making their heater core end caps out of copper and aluminum and began making the end caps of their heater cores out of types of plastic. They quickly learned that unlike metal end caps, plastic end caps would sometimes rupture, spraying scalding liquid onto the feet and legs of the driver and/or passenger.

10. On April 14, 1992, in recall #92V050000, 650,000 Volkswagen ("VW") Golfs, Jettas and GTI's manufactured between 1985-90 were recalled, because under hot conditions, the plastic end caps on their heater cores were prone to rupture and burn passengers and drivers.

11. VW's recommended fix was a replacement heater core with a stronger plastic end cap. The plastic end caps on these replacement heat cores later began to rupture, causing third degree burns and monetary settlements. See, e.g., Cree v. Volkswagen, 2:00-cv-01945 FJM (D.Ariz. 2000).

12. On May 23, 1995, in recall #95V105000, 164,000 VW Foxes manufactured between 1987-93 were recalled for the same reason. This time, VW installed a bypass kit, which was designed to route excessively hot coolant to the engine, without it flowing through the heater core. VW also installed a plastic cover underneath the dashboard to protect the passenger from hot liquid, in the event of a rupture.

13. On July 1, 1996, in recall #96V115000, 8100 VW Corrados and Passats manufactured between 1988-90 were recalled for the same reason. Once again, VW's recommended fix was a replacement heater core with a stronger end cap.

14. On November 13, 1998, in recall #98V295000, 6217 VW Corrados manufactured between 1992-94 were recalled for the same reason. VW's fix was to install a pressure reducer with a 5 millimeter diameter, secured by a spring tensioned hose clamp, in the coolant inlet hose to the heater core.

15. By late 1998, over 828,000 vehicles had been recalled because the plastic end caps on their heater cores were prone to rupture under hot conditions.

**VEHICLE IN QUESTION**

16. Non party Brian Kipp owned a 1999 Cadillac Deville Concours, VIN

1  #G6KF5498XU722724.  In April, 2010, it had been driven barely 10,000 miles per year and
2  had 112,000 miles.  Kipp took it in at that time for a lube and general maintenance at Classic
3  Car Spa, 1555 West Warner Road in Gilbert, Arizona.  Three months later, at 116,000 miles,
4  he brought it back in for another lube and general maintenance.  Three months thereafter, at
5  120,000 miles, he brought it in for a lube.

6        17. Three months thereafter, at 126,000 miles, in January, 2011, he brought it in for
7  another lube and general maintenance.  He did the same at 129,000 miles, two months later.
8  Over the next year, he drove 20,000 miles and brought it in for a lube three more times.

9        18. In May, 2012, Kipp took the vehicle to Allen's Automotive in Mesa, Arizona and
10 they replaced the radiator, hoses and hose clamps, along with new fluids.  Four months later, he
11 took the vehicle back to Classic Car Spa, for another lube and the coolant and transmission
12 fluid were checked and found to be adequate.

13       19. A month later, Kipp took the vehicle to After Hours Automotive in Avondale and
14 replaced the water pump, the hoses and the fuel filter.  At around this time, Kipp got a second
15 vehicle and subsequently drove the Cadillac very little.  Between September, 2012 and January,
16 2015, the vehicle was driven barely 13,000 miles, considerably less than 500 miles per month.

17       20. In approximately, May, 2014, Kipp sold the vehicle to his roommate, Plaintiff
18 Tyrrell Peterson.  Peterson replaced the fuel filter in May, 2014.  Peterson drove the car very
19 sparingly, putting little mileage on it.

20 **CIRCUMSTANCES OF THE ACCIDENT**

21       21. On January 28, 2015, the vehicle had 173,723 miles and was driven very sparingly.
22 Peterson was driving it near Baseline Road and 48th Street.  He heard a sudden popping sound
23 and steam began heavily coming out from under the hood.

24       22. Thinking the car was on fire, Peterson pulled over to investigate.  When he did so,
25 he realized his foot and lower leg were soaking wet and badly burning.  Peterson called his
26 friend Tristan Moncrief and Moncrief came and got him to St. Luke's Hospital in Tempe,
27 Arizona.

28       23. Counsel has retained the subject vehicle in storage.  On videotape, Counsel's

experts opened up the lower dashboard and removed the heater core. On information and belief, it is an AC Delco 15-60064. Although the vehicle was manufactured after 828,000 vehicles had been recalled because their heater core plastic end caps were prone to rupture, the heater core has a plastic end cap and it badly ruptured, allowing the escape of scalding liquid, which burned Peterson. The heater core has been preserved.

## COURSE OF TREATMENT

23. Peterson does not smoke, drinks three beers per week and has no history of drug usage. He was treated and released after five hours by St. Luke's Hospital.

24. Five days later, he presented at the Arizona Burn Clinic and was sent home with silvadene ointment and told to apply it. Four days thereafter, he again presented at the clinic and was admitted from there into the Arizona Burn Center.

25. Peterson was in patient at the Burn Center, with full thickness, third degree burns, until his discharge on February 13, 2015. During his stay, he had debridement with allograft and later, debridement with wound vac placement.

26. Peterson visited a Physician's Assistant at the Burn Clinic on February 17, 2015 and again on February 24, 2015 and was scheduled for additional surgery on March 5, 2015. On March 5, 2015, Peterson underwent tangential excision and debridement and was in patient at the Burn Center from March 5 to March 10, 2015.

27. Peterson subsequently saw a Physician's Assistant at the Burn Clinic in follow up on March 17, March 24 and April 7, 2015. He has medical specials of $218,332.92, permanent scarring which makes walking painful and he missed nine weeks of work.

## DEFENDANTS HAVE KNOWN OF THIS PROBLEM FOR A LONG TIME

28. Defendants were aware of the recalls referenced above, before this vehicle was manufactured. On information and belief, Defendants also received complaints regarding failures substantially similar to the one referenced herein, both before and after this vehicle was manufactured and sold.

29. In addition, on January 18, 2009, a heater core in a 1999 Cadillac Deville ruptured, causing third degree burns. A public complaint was filed two weeks later with the National

1  Highway Traffic Safety Administration, NHTSA ID #10257799.  Defendants were aware of
2  this.
3        30. Under the Transportation Recall Enhancement Accountability and Documentation
4  Act, when a manufacturer learns that a vehicle or its component parts contain a safety defect,
5  the manufacturer must promptly disclose this to vehicle owners. 49 U.S.C. § 30118(c)(1).  On
6  information and belief, this was never done by Defendants.

**CAUSES OF ACTION**

**COUNT ONE - NEGLIGENT DESIGN (All Defendants)**

      31. Plaintiff repeats the allegations as if set forth herein.

      32. Defendants failed to meet the standard of care in designing the vehicle at issue herein and the component it contained.

      33. Said failure was the proximate cause of substantial damages to Plaintiff.

      34. Said failure includes, but is not limited to: a) failing to use an end cap made of aluminum, copper or some other type of metal; b) failing to use an end cap made of some other substance sufficient to stand the temperatures which a heater core is exposed to; c) failing to provide some type of shield to prevent a core rupture from emptying scalding liquid on a vehicle occupant while driving; d) failing to provide a bypass device to route excessively hot coolant away from the heater core; e) failing to provide a heater core pressure reducer, as VW did for the 1992-94 Corrado recall.

**COUNT TWO - NEGLIGENT FAILURE TO WARN (All Defendants)**

      35. Plaintiff repeats the allegations as if set forth herein.

      36. Defendants negligently failed to warn and this caused Plaintiff's injuries.

      37. Defendants typically try to defend these cases by arguing maintenance issues or an overheat.  In light of this, it is incumbent upon Defendants to place a large placard in the vehicle and on the heater core stating "WARNING: IN THE EVENT OF MAINTENANCE ISSUES OR AN OVERHEAT, SCALDING LIQUID SUFFICIENT TO CAUSE THIRD DEGREE BURNS MAY SPRAY ON THE OPERATOR OF THE AUTOMOBILE DURING OPERATION" or something comparable.

38. No such warnings were provided.

**COUNT THREE - STRICT LIABILITY/DESIGN DEFECT (All Defendants)**

39. Plaintiff repeats the allegations as if set forth herein.

40. Defendant GM assumed all liability for the design, manufacture and sale of the 1999 Cadillac Deville Concours. Defendant AC Delco designed, manufactured and sold the heater core, which on information and belief is an AC Delco 15-60064.

41. The 1999 Cadillac Deville Concours and its heater core failed to perform as safely as an ordinary consumer would expect when they were used in a foreseeable manner. The harmful consequences of the design as described herein also outweigh the advantages of the design, of which there are none, other than a small price difference. In light of this, the 1999 Cadillac Deville Concours and its heater core are defective and unreasonably dangerous.

42. Said design defect proximately caused Plaintiff very substantial damages.

**COUNT FOUR - STRICT LIABILITY/INFORMATION DEFECT (All Defendants)**

43. Plaintiff repeats the allegations as if set forth herein.

44. The 1999 Cadillac Deville Concours and its heater core were used in a foreseeable fashion and said use was unreasonably dangerous, because no adequate warning and instructions were given.

45. The lack of an adequate warning and instruction proximately caused severe damages to Plaintiff.

**COUNT FIVE - PUNITIVE DAMAGES (All Defendants)**

46. Plaintiff repeats the allegations as if set forth herein.

47. Defendants knew even before manufacturing the products at issue herein that they were defective and would cause severe injuries. They went forward with the defective design, in order to save a small amount of money. They also could have warned their customers and replaced the defective parts, but chose the strategy of ignoring the problem, again to save money.

48. Defendants had an evil hand, guided by an evil mind and are fully liable for punitive damages.

**JURY REQUEST**

49. Plaintiff hereby requests a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment against Defendants for:

A. Compensatory damages;

B. Costs;

C. Post judgment interest on all sums;

D. Punitive damages; and

E. Any other relief that the Court sees fit to grant.

DATED this 16th day of June, 2015.

THE ENTREKIN LAW FIRM

By: s/Lance Entrekin
B. Lance Entrekin, Esq.
The Entrekin Law Firm
One East Camelback Road
Suite 710
Phoenix, Arizona 85012